FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

JUN 02 2014

JOHN LEY
CLERK

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

Case No.: _____

Middle District of Florida Docket No.:
8:11-cr-115-T-30MAP

**In re: WellCare Health Plans, Inc.,**

**Petitioner**

**vs.**

**United States District Court for the Middle District of Florida,**

**Respondent;**

United States v. Todd S. Farha, Paul L. Behrens, William L. Kale, Peter E. Clay

Additional Respondents/Real Parties In Interest

---

# PETITION FOR WRIT OF MANDAMUS PURSUANT TO THE CRIME VICTIMS' RIGHTS ACT, 18 U.S.C. § 3771(d)(3)

---

Gregory W. Kehoe, Esq.
FBN: 0486140
kehoeg@gtlaw.com
Greenberg Traurig, P.A.
Courthouse Plaza
625 East Twiggs Street, Suite 100
Tampa, FL 33602
(813) 318-5700
(813) 318-5900

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................... iii

I.   STATEMENT OF RELIEF SOUGHT............................................. 1

II.  ISSUES PRESENTED ................................................................ 1

III. STATEMENT OF THE CASE ...................................................... 2

    A.   Defendants Committed Health Care Fraud. ............................ 3

    B.   WellCare Suffered Significant Harm. ..................................... 5

        1.   WellCare Restated its Audited Financial Statements
            for a Period of Years to Correct Misstatements Made
            as a Result of Defendants' Misconduct.......................... 5

        2.   WellCare Immediately Initiated an Internal Investigation
            of Defendants' Misconduct. ............................................ 7

        3.   WellCare Provided Counsel to its Current and Former
            Employees and Board Members Involved in the
            Investigations ................................................................. 8

        4.   WellCare Confronted and Settled Civil Litigation
            Resulting from Defendants' Crime ................................ 8

            i.   The Class Actions ................................................ 9

            ii.  The Derivative Actions........................................ 10

        5.   WellCare Paid Defendants' Salary, Bonuses and Other
            Compensation while the Fraud was Ongoing ............... 12

    C.   WellCare Sought Restitution in the District Court.................. 13

    D.   Standard of Review ............................................................... 14

IV.    STATEMENT OF WHY THE WRIT SHOULD ISSUE .................    14

    A.    As a Matter of Law, the Definition of Victim Under Both
        the MVRA and the CVRA is Broad........................................    15

    B.    As a Matter of Law, WellCare is a Victim Under Both the
        MVRA and the CVRA. ...........................................................    17

V.    CONCLUSION...................................................................................    27

# TABLE OF AUTHORITIES

## Case Law

*Hughey v. United States*, 495 U.S. 411 (1990) .............................................. 16

*In re Instituto Costarricense di Electricidad*, No. 11-12707-G
    (11th Cir. June 17, 2011) ........................................................ 14

*In re Stewart*, 552 F.3d 1285 (11th Cir. 2008)............................................. *passim*

*In re Stewart*, 641 F.3d 1271 (11th Cir. 2011)............................................. 14

*United States v. Alcatel-Lucent France, SA*, 688 F.3d 1301
    (11th Cir. 2012)................................................................ 13, 25

*United States v. Brown*, 665 F.3d 1239 (11th Cir. 2011) ............................ 16, 17

*United States v. Coon*, No. 8:08-CR-441-T-17MAF, 2010 WL 1956614
    (M.D. Fla. May 7, 2010)...................................................... 16, 17

*United States v. Cummings*, 189 F. Supp. 2d 67 (S.D.N.Y. 2002) .............. 18-20

*United States v. Donaghy*, 570 F. Supp. 2d 411 (E.D.N.Y. 2008) .............. 16

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) ................... 21-23

*United States v. Gupta*, 925 F. Supp. 2d 581 (S.D.N.Y. 2013) ................... 23

*United States v. Lazarenko*, 624 F.3d 1247 (9th Cir. 2010) ........................ 13, 25

*United States v. Piggie*, 303 F.3d 923 (8th Cir. 2002).................................. 23-25

*United States v. Robertson*, 493 F.3d 1322 (11th Cir. 2007)....................... 15-16

*United States v. Sapoznik*, 161 F.3d 1117 (7th Cir. 1998)........................... 25

*United States v. Skowron*, 839 F. Supp. 2d 740 (S.D.N.Y. 2012) ............... 20-21

*United States v. Skowron*, No. 12-1284-CR, 2013 WL 3593780
    (2d Cir. July 16, 2013) ....................................................... 20-21

## Statutes

18 U.S.C. § 1347 ................................................................ 5

18 U.S.C. § 19627 .............................................................. 25

18 U.S.C. § 3663A ............................................................. *passim*

18 U.S.C. § 3771 ............................................................... *passim*

## Rules

Fed. R. App. P. 21 ............................................................. 1, 3

## I.    STATEMENT OF RELIEF SOUGHT

WellCare Health Plans, Inc. ("WellCare" or "the Company") was a victim of the crimes of which Defendants Farha, Behrens and Kale were convicted.  It sought restitution in the District Court pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771 ("CVRA") and the Mandatory Victims' Restitution Act, 18 U.S.C. § 3663A ("MVRA").  Contrary to law, *see In re Stewart*, 552 F.3d 1285, 1289 (11th Cir. 2008), the District Court found that WellCare was not a victim as that term is used in the CVRA and the MVRA because it was not the direct target of the criminal conduct.

WellCare respectfully petitions this Court pursuant to the CVRA, 18 U.S.C. § 3771(d)(3) and Fed. R. App. P. 21, for a writ of mandamus.  WellCare requests this Court: (1) find that WellCare is a victim under the CVRA and the MVRA; and (2) direct the District Court to vacate its denial of WellCare's Motion to be Recognized as a Crime Victim and to be Awarded Restitution and hold a hearing to determine the amount of WellCare's restitution.

## II.    ISSUES PRESENTED

Whether the District Court erred by denying WellCare's Motion to be Recognized as a Crime Victim and to be Awarded Restitution (hereinafter referred to as "WellCare's Motion") on the ground that WellCare is not a "victim" as that term is used in the CVRA and the MVRA.

## III.  STATEMENT OF THE CASE

Todd Farha and Paul Behrens committed fraud while serving as CEO and CFO of WellCare.  They caused the Company to file false reports with Florida's Agency for Health Care Administration ("AHCA").  The false reports reduced the amount of refunds WellCare was required to pay to AHCA, and thereby increased WellCare's reported earnings by millions of dollars.  The jury convicted Farha and Behrens of health care fraud.  As a direct consequence of the fraud perpetrated by Farha, Behrens and a third Defendant, William Kale (WellCare's former Vice President of Government and Regulatory Affairs), WellCare suffered hundreds of millions of dollars in losses, including the cost of restating its financial statements; providing counsel to current and former employees and board members in connection with the various internal and governmental investigations and lawsuits; and defending against and resolving class and derivative litigation arising from Defendants' conduct.  WellCare paid Farha and Behrens well over one hundred million dollars during their employment at WellCare.

Yet the District Court denied WellCare's request for restitution because, it believed, WellCare had not suffered direct harm from the fraud and was, therefore, not a victim.  WellCare has reluctantly filed this petition – the mechanism that Congress has provided as WellCare's only recourse –  to ask this Court to review and reverse the District Court's decision.

2

## A.    Defendants Committed Health Care Fraud

On October 24, 2007, approximately 225 agents from the Federal Bureau of Investigation, the Office of the Inspector General for the United States Department of Health and Human Services, and the Florida Attorney General's Medicaid Fraud Control Unit executed a search warrant at the Company's Tampa headquarters. (*See* Portions of the February 26, 2013 Trial Testimony of Eduardo Ortega at 45-50, 68-69, attached as Exhibit 1 to WellCare's Motion, Mandamus Ex. C.[1]) Shortly thereafter, WellCare learned that it was also being investigated by the Securities and Exchange Commission, the United States Department of Justice, and the State of Connecticut's Attorney General's Office. (*See* WellCare's March 3, 2008 Form 12b-25, attached as Exhibit 2 to WellCare's Motion, Mandamus Ex. C.)

When news of the execution of a search warrant at WellCare headquarters broke on October 24, 2007, the New York Stock Exchange halted trading of the Company's shares for a day, but not before the share price fell 5.8%, from $122.27 to $115.17 per share. (*See* March 31, 2014 Affidavit of Chief Accounting Officer Maurice Hebert (hereinafter "Hebert Affidavit") at ¶ 18, attached as Exhibit 3 to WellCare's Motion, Mandamus Ex. C.) When trading resumed the next day, WellCare shares closed at $42.67, down more than 65%. (*Id.*) In the months that

---

[1]    In accordance with Fed. R. App. P. 21(a)(2)(C), WellCare has filed a separate set of exhibits herewith, which are cited as "Mandamus Ex. __"

followed, WellCare was unable to submit mandatory filings with the SEC. These delays threatened WellCare with the prospect of being delisted from the New York Stock Exchange, and exposed it to other financial risks, including possible default on its credit facility. Because Defendants' fraud was against the government, WellCare was in jeopardy of debarment from both federal and state health care programs. (*See* Portions of WellCare's January 26, 2009 10-K at 36-37, attached as Exhibit 5 to WellCare's Motion, Mandamus Ex. C.) Because WellCare's entire business was as a government contractor, debarment would have been fatal to its business.

On March 2, 2011, a federal grand jury charged Farha, Behrens and three other former officers and senior employees of WellCare with conspiracy, making false statements and health care fraud. (*See* Indictment, Mandamus Ex. A.) The indictment alleged that Defendants submitted false and fraudulent information to AHCA relating to the expenditures of WellCare's two Florida Medicaid HMOs on behavioral health care. The indictment further charged that in their submissions to AHCA, Defendants inflated the amount each HMO spent on behavioral health care in order to reduce the amount of the refunds WellCare owed to AHCA under Florida statute and the Company's contracts with Florida.

On June 10, 2013, after a twelve-week trial, the jury found Farha, Behrens and Kale guilty of health care fraud in violation of 18 U.S.C. § 1347, for engaging in a scheme to defraud AHCA in 2007.[2] (*See* Verdict Forms, Mandamus Ex. B.)

## B.   WellCare Suffered Significant Harm

WellCare is a victim of Defendants' crimes.  It has been and continues to be directly and proximately harmed by Defendants' criminal conduct.

### 1.   WellCare Restated its Audited Financial Statements for a Period of Years to Correct Misstatements Made as a Result of Defendants' Misconduct.

During the course of their health care fraud scheme, Defendants Farha and Behrens caused the Company to file false statements relating to the Company's earnings and financial condition in the Company's SEC filings.  They knew that the Company was reporting materially inflated revenue, yet personally certified that "[t]he Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities and Exchange Act of 1934" and that "[t]he information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company." (*See, e.g.*, Portions of WellCare's February 15, 2005 Form 10-K at Exhibits 32.1 and 32.2, attached as Exhibit 8 to WellCare's Motion, Mandamus Ex. C.)  Once Defendants' fraud came to light, the Company was forced to issue restated audited financial statements.

---

[2]    Peter Clay was also convicted for making false statements to federal agents. The Company is not pursuing restitution against him.

5

WellCare retained FTI Consulting, Inc. to work with Deloitte LLP, WellCare's independent accountant, to assist the Company in restating its audited financials. (*See* Hebert Affidavit at ¶ 9, attached as Exhibit 3 to WellCare's Motion, Mandamus Ex. C.)  On January 26, 2009, the Company restated WellCare's financial statements for the years ended December 31, 2004, 2005, and 2006, including the quarterly periods contained therein.   (*See id.*) (*See also* Portions of WellCare's January 26, 2009 10-K at 3, F-3 - F-6, attached as Exhibit 5 to WellCare's Motion, Mandamus Ex. C.)  Additionally, on February 6, 2009, the Company filed Amended Quarterly Reports for the three-month periods ended March 31, 2006 and March 31, 2007 and the three- and six-month periods ended June 30, 2006 and June 30, 2007.   (*See* Hebert Affidavit at ¶ 9, attached as Exhibit 3 to WellCare's Motion, Mandamus Ex. C.) (*See also* WellCare's February 6, 2009 Form 10-Q/A for quarter period ended March 31, 2007, attached as Exhibit 9 to WellCare's Motion, Mandamus Ex. C; WellCare's February 6, 2009 Form 10-Q/A for quarter period ended June 30, 2007, attached as Exhibit 10 to WellCare's Motion, Mandamus Ex. C.) WellCare's total cost incurred in preparing and filing its restated financial statements was $7,216,965. (*See* Hebert Affidavit at ¶ 10, attached as Exhibit 3 to WellCare's Motion, Mandamus Ex. C.)

### 2.     WellCare Immediately Initiated an Internal Investigation of Defendants' Misconduct.

On October 26, 2007, two days after the search warrant was executed, WellCare's Board of Directors established a Special Committee to conduct an internal investigation of the wrongdoing that precipitated the government's execution of the search warrant. (*See* WellCare's October 30, 2007 Form 8-K, attached as Exhibit 6 to WellCare's Motion, Mandamus Ex. C.) The Special Committee retained the law firm of Davis Polk & Wardwell LLP ("Davis Polk") to assist with the investigation. (*See* Portions of the Davis Polk February 20, 2008 Presentation to the Special Committee of the Board of WellCare Health Plans, Inc. at 3, attached as Exhibit 7 to WellCare's Motion, Mandamus Ex. C.) Over the next four months, the Special Committee, through Davis Polk, conducted approximately 81 interviews of 52 employees and eight non-employees, and reviewed more than 930,000 documents. (*See id.*) The Special Committee also retained consultants to analyze data to calculate the amounts by which Farha, Behrens and Kale underreported the amount WellCare was required to refund to AHCA. (*See id.*) WellCare shared the Special Committee's findings with the government. WellCare's total cost for this internal investigation was $74,998,114. (*See* Hebert Affidavit at ¶¶ 12-14, attached as Exhibit 3 to WellCare's Motion, Mandamus Ex. C.)

### 3. WellCare Provided Counsel to its Current and Former Employees and Board Members Involved in the Investigations.

Starting in October of 2007, current and former employees and Board members (not including Defendants) have been called upon to assist with both the government's and WellCare's investigations of claims relating to Defendants' misconduct. These have included inquiries from and investigations by at least eight state and federal agencies, two internal investigations, and federal prosecutions of several Defendants. Each time a current or former employee or Board member provided such assistance, WellCare paid for that employee's or Board member's counsel.

Additionally, current and former board members (other than Defendant Farha), all of whom were cleared of any wrongdoing as a result of a Special Litigation Committee investigation, were named as defendants in the derivative litigation. WellCare paid for counsel for the board members in those cases.

This category of expense totals $14,023,739 to date. (*See* Hebert Affidavit at ¶¶ 15-17, attached as Exhibit 3 to WellCare's Motion, Mandamus Ex. C.)

### 4. WellCare Confronted and Settled Civil Litigation Resulting from Defendants' Crimes.

Within days after the execution of the search warrant, WellCare found itself facing multiple civil lawsuits resulting from Defendants' crimes.

### i.    The Class Actions

In October and November 2007, WellCare shareholders filed two class actions in the United States District Court for the Middle District of Florida alleging violations of federal securities laws stemming from Defendants' scheme – *Eastwood Enters., LLC v. Farha, et al.*, No. 8:07-cv-1940 (M.D. Fla.), and *Hutton v. WellCare Health Plans, Inc. et al.*, No. 8:07-CV-01993 (M.D. Fla.).   Although the class action complaints made a range of allegations, the consolidated complaint summarized the action as being "about a managed health care company that misappropriated Medicaid funds in order to artificially inflate its publicly reported income and its stock price." (*See* Consolidated Class Action Complaint for Violations of Federal Securities Laws, *Eastwood Enterprises, LLC v. Farha et al.*, 8:07-cv-1940 (M.D. Fla.) at ¶ 1, attached as Exhibit 11 to WellCare's Motion, Mandamus Ex. C.)  The consolidated complaint asserted that Defendants inaccurately reported the Company's medical loss ratios in order to decrease the amount of the refunds WellCare was required to pay to state agencies.  (*Id.* at ¶¶ 52-77.)  That is the same conduct of which Defendants were convicted.

WellCare's fees and costs for defending these suits amounted to $5,669,848. (*See* Hebert Affidavit at ¶¶ 20(a)-20(c), attached as Exhibit 3 to WellCare's Motion, Mandamus Ex. C.) WellCare settled the suits for $200 million, at a financial cost to the Company of $189,193,000. (*Id.* at ¶ 20(d).)

### ii.    The Derivative Actions

Between November 2007 and January 2008, shareholders filed federal and state derivative actions on behalf of WellCare, alleging that Board members, Defendants Farha and Behrens, and former General Counsel Thaddeus Bereday were liable to the Company in connection with Defendants' criminal activities. The consolidated state-court derivative action focused entirely on Defendants' scheme to defraud AHCA with respect to behavioral health refunds – the conduct for which they were convicted.  (*See* Plaintiffs' Second Amended Consolidated Verified Shareholder Derivative Complaint, *In re WellCare Health Plans Derivative Litigation*, 07-015349 (Fla. Cir. Ct.) at ¶¶ 51-65, attached as Exhibit 12 to WellCare's Motion, Mandamus Ex. C.)  Although the consolidated federal derivative action made a range of allegations of wrongdoing by Defendants, it included assertions that Defendants falsely inflated expenditure information relating to behavioral health services in order to decrease the amount of the refund paid to AHCA, which was their conduct of conviction.  (*See* Verified Second Amended Consolidated Shareholder Derivative Complaint, *Rosky v. Farha et al.*, No. 8:07-cv-1952 (M.D. Fla.) at ¶¶ 54-56, attached as Exhibit 13 to WellCare's Motion, Mandamus Ex. C.)

In April 2009, in response to the shareholder derivative suits, the Board established an independent Special Litigation Committee ("SLC") and empowered

it to investigate the allegations in the derivative suits.  The SLC retained Venable LLP to assist in the investigation.  The SLC interviewed more than 30 employees and reviewed over 600,000 documents, as well as numerous other relevant materials.  (*See* Report of the Special Litigation Committee of the Board of Directors of WellCare, November 20, 2009 at 2, 33-43, attached as Exhibit 14 to WellCare's Motion, Mandamus Ex. C.)  Following its investigation, the SLC shared its findings with the government, including the critical and uncontroverted finding that no WellCare Board member other than Defendant Farha had knowledge of Defendants' fraud.

Based on the SLC's findings, WellCare moved (1) to dismiss the claims alleged in the state and federal shareholder derivative complaints against the Board member defendants, and (2) to realign WellCare as the Plaintiff against Defendants Farha, Behrens and Bereday in each of those suits.  WellCare subsequently settled the derivative actions and paid plaintiffs' counsel $2,250,000.  (*See* Hebert Affidavit at ¶ 23(c), attached as Exhibit 3 to WellCare's Motion, Mandamus Ex. C.)  The Courts granted WellCare's motions to realign and dismiss in both the state and federal actions.  To date, WellCare has spent $7,212,411 in connection with the shareholder derivative suits, including investigating the claims and providing representation for the SLC in connection with court appearances and filings,

resolving the derivative claims and prosecuting the Company's claims as the realigned plaintiff.  (*See id.* at ¶¶ 23-24.)

### 5.    WellCare Paid Defendants' Salary, Bonuses and Other Compensation while the Fraud was Ongoing.

While Defendants were covertly carrying out their health care fraud scheme, they were collecting substantial compensation from the Company for what the Board of Directors thought were honest jobs well done.  From 2003 to 2008, Defendant Farha received $64,036,988 in salary, bonuses, and the realized value of stock sales.  He also received additional restricted stock presently valued at $37,210,612.[3]  From 2003 to 2008, Defendant Behrens collected $18,545,947 in salary, bonuses, and the realized value of stock sales.  He also received additional restricted stock, which is presently valued at $12,249,874.  From 2003 to 2008, Defendant Kale collected $2,112,945 in salary and bonuses.  (*See* Hebert Affidavit at ¶¶ 25-30, attached as Exhibit 3 to WellCare's Motion, Mandamus Ex. C.)

In sum, WellCare paid Defendants compensation of over $134 million for what they passed off as honest services, but which were in fact criminal.

---

[3]    The restrictions, which prevent the sale of the stock, were still in place at the time of the execution of the search warrant.  Having learned of Defendants' fraud, WellCare has refused to lift the restrictions on this stock, as well as on the additional restricted stock that Defendant Behrens received.  The "present" value of the "restricted stock" is as of March 27, 2014.

### C.    WellCare Sought Restitution in the District Court

On April 16, 2014, five weeks before sentencing, WellCare filed a motion to be recognized as a crime victim pursuant to the CVRA and to receive restitution from Defendants Farha, Behrens and Kale under the MVRA.  WellCare's motion established that WellCare is a victim of Defendants' crimes; has suffered significant harm as a result of Defendants' crimes; and is due restitution under the CVRA and the MVRA.  It also established the amount of restitution that WellCare is due.  The government did not take a position on the motion.  Defendants opposed it.

A brief hearing was held on WellCare's motion at the end of Defendants' sentencing on May 19, 2014.  The District Court denied WellCare's request on the sole ground that WellCare was not a "victim" under federal statute, holding as follows:

> I'm persuaded by the definition of "victim" in both the MVRA and the CVRA that defines a victim as a person directly and proximately harmed as a result of the commission of a federal offense.  In this particular case, WellCare has been harmed collaterally but not directly.  Had the money been embezzled from WellCare, that would have been a direct harm; but in this case, their losses are collateral.  And I'm persuaded by *United States v. Lazarenko*, 624 F.3d 1247, the Ninth Circuit Court of Appeals, 2010; and then the *Alcatel-Lucent France* case uses similar reasoning for the CVRA, and that's 688 F.3d 1301, Eleventh Circuit, 2012.

13

(Transcript of May 19, 2014 Hearing on WellCare's Motion at 17, Mandamus Ex. F.)[4]

### D.    Standard of Review

In reviewing a petition for writ of mandamus under § 3771(d)(3), the Eleventh Circuit "must determine 'whether the district [court] ... base[d] its decision on findings of fact that are clearly erroneous ... [and] if not, [whether] it misappl[ied] the law to such findings." *In re Instituto Costarricense di Electricidad*, No. 11-12707-G (11th Cir. June 17, 2011) (citing *In re Stewart*, 641 F.3d 1271, 1275 (11th Cir. 2011)).

## IV.   STATEMENT OF WHY THE WRIT SHOULD ISSUE

The District Court misapplied the law, including *In re Stewart*, 552 F.3d 1285, 1289 (11th Cir. 2008). Its denial of WellCare's Motion was based solely on its conclusion that WellCare is not a "victim" under the MVRA or the CVRA because it did not suffer direct harm. The District Court accepted WellCare's factual assertion that it had suffered damages. The Court reached a legal conclusion that those damages were not "direct" damages; therefore, it concluded that WellCare is not a victim under the MVRA and the CVRA. The District

---

[4]    In opposing WellCare's request for restitution, Defendants did not argue that WellCare was not a victim on the basis that Defendants' crimes had not caused WellCare direct and proximate harm; rather, Defendants argued that WellCare is not a victim because, they claimed, WellCare was their co-conspirator. (*See generally* Defendants' Response to WellCare's Motion to be Recognized as a Crime Victim and to be Awarded Restitution, Mandamus Ex. D.)

Court's ruling was incorrect because it misapplied the text of the statute, this Court's decisions, and the law as construed by other courts regarding what is direct harm under the MVRA and the CVRA.

### A.   As a Matter of Law, the Definition of Victim Under Both the MVRA and the CVRA is Broad.

Under the MVRA, a "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).  The CVRA defines a "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal Offense…." 18 U.S.C. § 3771(e).

There is no dispute that WellCare suffered harm.  Although the District Court described WellCare's harm as collateral, it nonetheless concluded that "WellCare has been harmed." (Transcript of May 19, 2014 Hearing on WellCare's Motion at 17, Mandamus Ex. F.)  The single question raised in this writ is whether the harm WellCare suffered was a direct and proximate result of Defendants' crimes.

To show "direct[] and proximate[]" harm, WellCare need only show that "a particular loss would not have occurred but for the conduct underlying the offense

of conviction" and that "the causal connection between the conduct and the loss is not too attenuated (either factually or temporally)." *United States v. Robertson*, 493 F.3d 1322, 1334 (11th Cir. 2007).  A loss is proximately caused by a defendant "if it is reasonably foreseeable as a natural and probable consequence of the defendant's criminal conduct." *United States v. Coon*, No. 8:08-CR-441-T-17MAF, 2010 WL 1956614, at *19 (M.D. Fla. May 7, 2010).  The defendant's conduct "need not be the sole cause of the loss, but any subsequent action that contributes to the loss, such as an intervening cause, must be directly related to the defendant's conduct." *Robertson*, 493 F.3d at 1334.

The definition of victim is "broad" and "expansive." *See United States v. Donaghy*, 570 F. Supp. 2d 411, 420 (E.D.N.Y. 2008); *United States v. Brown*, 665 F.3d 1239, 1252 (11th Cir. 2011).  The CVRA "does not limit the class of crime victims to those whose identity constitutes an element of the offense or who happen to be identified in the charging document." *In re Stewart*, 552 F.3d 1285, 1289 (11th Cir. 2008).  As this Court has previously stated, under the plain language of the CVRA, "*a party may qualify as a victim, even though it may not have been the target of the crime*, as long as it suffers harm as a result of the crime's commission." *Id.* (emphasis added).[5]

---

[5]    Following a Supreme Court decision narrowing the category of persons eligible to receive restitution, *see Hughey v. United States*, 495 U.S. 411, 413 (1990), Congress expanded the definition of victim to include those who have

16

*In re Stewart* provides that the steps to determine whether an entity is a "crime victim" are as follows: "first, we identify the behavior constituting 'commission of a Federal Offense.' Second, we identify the direct and proximate effects of that behavior on parties other than the United States." *Id.* at 1288. Once that has been completed, "[i]f the criminal behavior causes a party direct and proximate harmful effects, the party is a victim under the CVRA." *Id.*

### B.    As a Matter of Law, WellCare is a Victim Under Both the MVRA and the CVRA.

Defendants' criminal conduct directly and proximately harmed WellCare. But for Defendants' crimes, the Company would not have been required to restate its financial statements; to investigate Defendants' conduct; to provide counsel to current and former employees and board members in connection with the various internal and governmental investigations and lawsuits; and to defend against and resolve class and derivative litigation arising from Defendants' conduct. WellCare would not have paid Defendants their salary and bonuses had it been aware of their criminal conduct. Each of these harms was "reasonably foreseeable as a natural and probable consequence of the defendant's criminal conduct." *Coon*, 2010 WL 1956614, at *19.

---

suffered losses "for conduct closely related to the offense of conviction." *Brown*, 665 F.3d at 1252. This Court has repeatedly rejected attempts to narrow the scope of the definition of victim under the Act. *Id.* at 1253.

In denying WellCare's motion, the District Court held that these harms were collateral, rather than direct. It stated that if Defendants had embezzled money from WellCare then it would have sustained direct damages. Under established law, however, what constitutes "direct[] and proximate[] harm" is not construed so narrowly. In fact, the District Court's ruling was directly contrary to *In re Stewart*, in which this Court held that "a party may qualify as a victim, even though it may not have been the target of the crime, as long as it suffers harm as a result of the crime's commission." *In re Stewart*, 552 F.3d at 1288.

Numerous other cases demonstrate that it is not necessary for an entity to be a target of a crime to qualify as a victim under the CVRA and the MVRA. In *United States v. Cummings*, 189 F. Supp. 2d 67, 69, 77-78 (S.D.N.Y. 2002), the former CFO of Aurora Food Inc., Cummings, pled guilty to three counts of an indictment in connection with her participation in a conspiracy to conceal trade promotion underaccruals at Aurora Foods Inc. between 1998 and 2000. "In furtherance of a decision to prevent disclosure of the underaccrual, Cummings engaged in a series of internal manipulations of Aurora's financial records. Specifically, Cummings … made inadequate accruals for known trade promotion expenses, failed to record accrued trade promotion expenses, and reclassified trade promotion expenses as receivables." *Id.* at 69. Like the health care fraud

18

perpetrated by Defendants Farha, Behrens and Kale, Cummings' fraud financially enhanced her company's earnings prior to its discovery.

Aurora sought restitution from Cummings, but Cummings argued that Aurora was not a victim of Cummings' crimes. The court disagreed. It noted that "contrary to the defendant's contention, it is not necessary that the alleged victim *incurred damages in the course of* the scheme, conspiracy or pattern. Rather, the question is whether the alleged victim was *directly harmed by the defendant's conduct* that occurred in the course of that conspiracy." *Id.* at 75 (emphasis in original). The court found that "Aurora was directly harmed by Cummings's financial manipulations to conceal the underaccrual. For instance, as a result of Cummings's financial manipulations and active concealment of the underaccrual, and her false statements to Aurora's auditors and the SEC, Aurora was forced to issue restated financials for the years 1998 and 1999." *Id.* at 75-76. Accordingly, the court found Aurora to be a victim of Cummings crimes even though the harm it sustained occurred "*after the unlawful concealment of the underaccrual was discovered.*" *Id.* at 69 (emphasis added).[6] WellCare suffered precisely the same harm here – it had to restate its financial statements at a cost of $7,216,965.

---

[6]     The court awarded Aurora $2,583,840 in restitution for losses it sustained when it was required to file restated financial statements for 1998 and 1999. *Id.* at 69. That amount included accounting fees, additional fees paid to Deloitte & Touche and printing charges. *Id.* at 71. The court also concluded that Aurora could have been awarded restitution for the settlement it paid in a securities fraud

Likewise, in *United States v. Skowron*, 839 F. Supp. 2d 740 (S.D.N.Y.

2012), Skowron was convicted of one count of conspiring to commit securities

fraud and to obstruct an SEC investigation. Skowron was a Managing Director of

Morgan Stanley and a portfolio manager of FrontPoint hedge funds. *Id.* at 745.

Skowron bribed an advisor to Human Genome Sciences, Inc. ("HGSI") to provide

Skowron with nonpublic information regarding the results of clinical trials of an

HGSI drug. When HGSI's advisor tipped Skowron about negative results in the

clinical trials, Skowron caused FrontPoint traders to sell off FrontPoint's

significant holdings in HGSI stock, avoiding millions of dollars in losses. *Id.*

Initially, like the fraud perpetrated by Defendants Farha, Behrens and Kale, and the

fraud perpetrated by Cummings, Skowron's actions financially benefited Morgan

Stanley.

The district court held, and the Second Circuit affirmed (*see United States v.*

*Skowron*, No. 12-1284-cr, 2013 WL 3593780 (2d Cir. July 16, 2013)), that Morgan

Stanley was a victim of Skowron's crimes under the MVRA and awarded Morgan

Stanley restitution.[7] The court reasoned:

---

class action lawsuit because "Aurora's public shareholders were directly harmed
by, and their loss directly resulted from, the conduct of Cummings and her co-
conspirators," but it did not have to award such restitution because Cummings had
already reimbursed Aurora for that loss. *Id.* at 78-79.

[7]      In *United States v. Skowron*, No. 12-1284-cr, 2013 WL 3593780 (2d Cir.
July 16, 2013), the Second Circuit upheld the lower court's restitution award of

Skowron's offenses of conviction directly and proximately harmed Morgan
Stanley. FrontPoint, a Morgan Stanley entity, was the vehicle or
"mechanism" through which Skowron committed his crimes. His crimes
deprived Morgan Stanley of the honest services of its employee, diverted
valuable corporate time and energy in the defense of Skowron and
FrontPoint, and injured Morgan Stanley's reputation. Skowron's cover-up
of his insider trading was a critical component of the scheme for which he
was convicted. Morgan Stanley launched its own internal investigation and
cooperated with the SEC probe. Skowron's lies to Morgan Stanley and its
investigators facilitated his deception of the SEC and were integral to that
deception. Morgan Stanley incurred substantial legal costs for itself,
Skowron, and other FrontPoint employees during the SEC investigation.
Morgan Stanley is therefore a victim of Skowron's offense under the
MVRA, and is eligible for restitution for its losses under that statute.

*Skowron*, 839 F. Supp. 2d at 745 (internal citation omitted).[8]

In *United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012), Gupta, a

former member of Goldman Sachs' Board of Directors, was convicted of one count

of conspiracy and three counts of substantive securities fraud in connection with

providing material non-public information to Raj Rajaratnam. Gupta provided

---

$10,247,853.49. That amount included 20% of Skowron's compensation at
Morgan Stanley between 2007 and 2010 and the attorneys' fees and costs Morgan
Stanley incurred as a result of the SEC investigation, part of which was for
attorneys' fees and costs that Morgan Stanley advanced to its employees.

[8] In ruling that Morgan Stanley was a victim of Skowron's crimes, the court
relied in part on the obstruction of justice element of Skowron's conviction. The
court, however, did not find that that conduct was determinative of Morgan
Stanley's status as a victim. Further, it is plain that Morgan Stanley would still
have suffered direct harm from Skowron's securities fraud crimes if Skowron had
not *also* lied to the SEC. Skowron's securities fraud "deprived Morgan Stanley of
the honest services of its employee, diverted valuable corporate time and energy in
the defense of Skowron and FrontPoint, and injured Morgan Stanley's reputation."
*Skowron*, 839 F. Supp. 2d at 745.

21

confidential inside information to Rajaratnam regarding an infusion of five billion

dollars into Goldman Sachs by Warren Buffett, which caused Rajaratnam to

purchase large quantities of Goldman stock prior to the public announcement of

Buffett's investment. *Id.* at 352-353. When the Buffett investment was announced

the following morning, the stock price surged, causing Rajaratnam, through his

Galleon funds, to realize an immediate gain of $1,231,630. *Id.* A month later,

Gupta again tipped Rajaratnam, this time that Goldman Sachs would be reporting

unexpected quarter losses. Rajaratnam immediately sold 150,000 Goldman shares

before the stock price fell. *Id.*

Gupta's insider trading scheme did not cause Goldman Sachs to suffer a

pecuniary loss, but *the court still treated Goldman Sachs as a victim entitled to*

*restitution.* Although the court did not address the specific issue of whether

Goldman Sachs was a victim in the context of restitution, in sentencing Gupta, the

court stated, "[i]n the eye of the law, Gupta's crime was to breach his fiduciary

duty of confidentiality to Goldman Sachs; or to put it another way, Goldman Sachs

… was the victim of Gupta's crime." *Id.* at 352. This breach of Gupta's fiduciary

duty to Goldman Sachs, which was not an element of the crimes for which Gupta

was convicted, constituted direct harm to Goldman Sachs, making Goldman Sachs a victim under the MVRA.[9]

In *United States v. Piggie*, 303 F.3d 923 (8th Cir. 2002), the Eighth Circuit upheld an order of restitution under the MVRA to four universities that were victims of Myron Piggie's crimes, even though the universities were not the target of Piggie's crimes, the universities and Piggie were unknown to each other at the time he engaged in the conduct of which he was convicted, and they were only injured after Piggie's crimes were revealed at a later date. Specifically, Piggie pled guilty to one count of conspiracy to commit mail and wire fraud and one count of failure to file an income tax return. *Id.* at 924. The conduct underlying Piggie's conviction was his scheme to pay talented high school athletes to play basketball for his "amateur" summer team. *Id.* "The payments were designed to retain top athletes on his team, gain access to sports agents, obtain profitable sponsorship contracts, and forge ongoing relationships with players to his benefit when the athletes joined the ... NBA." *Id.*

---

[9]    The court ordered Gupta to pay Goldman Sachs $6,218,223.59 in restitution for legal fees that Goldman Sachs paid to Sullivan & Cromwell. *United States v. Gupta*, 925 F. Supp. 2d 581, 588 (S.D.N.Y. 2013). That amount included "expenses incurred during Goldman Sachs's internal investigation into Gupta's conduct, as well as expenses incurred for work related to Goldman Sachs's advancement of Gupta's legal fees ... [and] legal fees incurred by Goldman Sachs to attend th[e] post-verdict restitution proceeding...." *Id.* at 585 (internal citations omitted).

Four such athletes, after accepting Piggie's illegal payments, submitted "false and fraudulent Student-Athlete Statements to the universities where they were to play intercollegiate basketball." *Id.* at 925. They falsely certified that they had "not previously received payments to play basketball." *Id.* The four universities subsequently awarded scholarships to the athletes, enrolled them in classes, and allowed them to play on NCAA basketball teams. *Id.*

Only *after* "Piggie's payments to these players were discovered," did the Universities suffer harm. *Id.* Specifically, "[e]ach school lost the use of one of [its] thirteen scholarships and lost the value of each player's participation due to the player's NCAA-required suspension... [T]he Universities [also] lost the opportunity to award the scholarships to other top amateur athletes, who had actual eligibility to play intercollegiate basketball." *Id.* "NCAA regulations also required each of the four Universities involved to conduct costly internal investigations after Piggie's scheme was discovered." *Id.* at 926. Further, "[t]he scandal following the disclosure of Piggie's scheme caused ... intangible harms to the Universities including adverse publicity, diminished alumni support, merchandise sales losses, and other revenue losses." *Id.*[10]

---

[10]    Piggie was ordered to pay restitution in the amount of $324,279.87, which included amounts that the universities lost in scholarships, and paid for penalties, internal investigations and attorneys' fees. *Id.* at 924-926.

The Court of Appeals for the Eighth Circuit upheld the district court's award of restitution to the universities. Although the Eighth Circuit reviewed the lower court's award only for plain error (because Piggie argued "for the first time on appeal that the district court committed plain error in including incidental or consequential damages in the restitution award"), there was no disagreement that the universities were victims under the MVRA. The harm that they suffered *after* Piggie's payments to the high school athletes were discovered constituted direct harm under the MVRA.[11]

The cases on which the District Court relied in reaching its ruling – *United States v. Lazarenko*, 624 F.3d 1247 (9th Cir. 2010) and *United States v. Alcatel-Lucent France SA*, 688 F.3d 1301 (11th Cir. 2012) – contain no discussion regarding what constitutes direct rather than collateral harm. Both of these cases

---

[11]    *See also United States v. Sapoznik*, 161 F.3d 1117, 1118 (7th Cir. 1998), in which the former chief of police of Northlake, a suburb of Chicago, received $500 a month from a branch of organized crime to protect illegal gambling in Northlake's bars and restaurants. He pled guilty to conducting an enterprise through a pattern of racketeering, in violation of the RICO statute, 18 U.S.C. § 1962(c). *Id.* The Court of Appeals for the Seventh Circuit upheld the district court's award of restitution to the City of Northlake. *Id.* at 1121. Although the court did not specifically address whether Northlake was a victim, it evidently concluded that Northlake was because it awarded Northlake restitution under the MVRA. The only harm that the court noted that Northlake sustained was paying the police chief his salary "under the false pretense that he was honest." *Id.* Specifically, the Court stated that "what Northlake lost as a consequence of Sapoznik's RICO violation was not his salary, but the difference in the value of the services that he rendered Northlake and the value of the services that an honest police chief would have rendered." *Id.*

analyzed whether actors who participated in the underlying criminal conduct can obtain restitution.

*Cummings, Skowron, Gupta, Piggie* and similar cases make it clear that harms that occur *after* the revelation of the criminal conduct constitutes "direct and proximate" harm.  It is also clear that a victim can *initially* benefit financially from the criminal conduct, but *ultimately* suffer direct and proximate harm.  The payment of salary to employees who are committing crimes can also constitute direct harm, as can an employee's breach of his or her fiduciary duties to the employer, and harm to a company's reputation.  WellCare suffered all of these harms.

There can be no question that, but for Defendants' health care fraud, WellCare would not have suffered any of the harms for which it seeks restitution. It was Defendants' conduct – reporting false information to AHCA regarding WellCare's expenditures for behavioral health care services in order to decrease the amount of refund WellCare was required to pay to AHCA and increase WellCare's reported earnings by millions of dollars – that caused multiple government agencies to investigate WellCare; that caused the execution of a search warrant at WellCare's headquarters by more than 200 government agents; that caused WellCare to file inaccurate financial statements with the SEC, thereby requiring WellCare to restate them; that caused WellCare's Board of Directors to

conduct an internal investigation to determine the breadth of Defendants' criminal conduct; that caused current and former employees and Board members to be called upon to assist with both the government's and WellCare's investigations for which the current and former employees and Board members needed legal representation; and that caused two class actions and five derivative actions to be filed against and/or on behalf of WellCare. Each of these harms was completely foreseeable based on the crimes that Defendants were committing.

There were no intervening events that caused these harms. They were caused solely by Defendants' crimes. WellCare should therefore be determined to be a victim of Defendants' crimes under the CVRA and the MVRA.

## V.    CONCLUSION

For the foregoing reasons, this Court should issue a writ of mandamus directing the District Court to find that WellCare suffered direct harm from Defendants' crimes and is therefore a victim under the CVRA and the MVRA, directing the District Court to vacate its denial of WellCare's Motion to be Recognized as a Crime Victim and to be Awarded Restitution, and directing the District Court to hold a hearing to determine the amount of WellCare's restitution.

Respectfully submitted this 30ᵗʰ day of May, 2014.

Gregory W. Kehoe, Esq.
FBN: 0486740
kehoeg@gtlaw.com
Greenberg Traurig, P.A.
Courthouse Plaza
625 East Twiggs Street, Suite 100
Tampa, FL 33602
(813) 318-5700
(813) 318-5900

#8188026v5

28

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30<u>th</u> day of May, 2014, the foregoing

documents were sent to the following individuals via UPS for delivery on Monday

June 2, 2014:


**United States District Court Judge:**
>    The Honorable James S. Moody, Jr.
>    **UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA**
>    Sam M. Gibbons U.S. Courthouse
>    801 North Florida Avenue
>    Tampa, Florida 33602


**Counsel for United States of America:**
>    Jay G. Trezevant
>    Cherie L. Krigsman
>    Natalie H. Adams
>    Karin B. Hoppman
>    **U.S. ATTORNEY'S OFFICE**
>    Tampa Office
>    400 N. Tampa Street, Suite 3200
>    Tampa, Florida 33602

>    John A. Michelich
>    **U.S. DEPARTMENT OF JUSTICE, CRIMINAL DIVISION**
>    Fraud Section
>    950 Constitution Ave., N.W., Room 4118
>    Washington, DC 20530

>    John J. Bowers
>    **SECURITIES & EXCHANGE COMMISSION**
>    100 F St NE
>    Washington, DC 20549

**<u>Counsel for State of Florida Agency for Health Care Administration:</u>**

> Lisa M. Raleigh
> Stephanie A. Daniel
> **OFFICE OF THE ATTORNEY GENERAL**
> PL-01 - The Capitol
> 400 S Monroe St
> Tallahassee, Florida  32399-1050

**<u>Counsel for Todd Farha:</u>**

> Peter George
> Douglas Titus
> Laura Vaughan
> **GEORGE & TITUS, PA**
> 100 S Ashley Drive, Suite 1290
> Tampa, FL 33602
>
> L. Barrett Boss
> **COZEN O'CONNOR**
> The Army & Navy Building
> 1627 I Street, Suite 1100
> Washington, DC 20006
>
> Seth P. Waxman
> **WILMER HALE, LLP**
> 1875 Pennsylvania Ave NW
> Washington, DC 20006
>
> Gregory R. Miller
> **BEGGS & LANE, RLLP**
> 215 S Monroe Street, Suite 710
> Tallahassee, FL 32301

**Counsel for Thad Bereday:**
    Jack E. Fernandez, Jr.
    Marcos E. Hasbun
    Morris Weinberg, Jr.
    Lee Fugate
    Nathan M. Berman
    **ZUCKERMAN SPAEDER, LLP**
    101 E Kennedy Blvd, Suite 1200
    Tampa, FL 33602

**Counsel for Paul Behrens:**
    John F. Lauro
    Michael G. Califano
    Todd J. Cooper
    **LAURO LAW FIRM**
    101 E Kennedy Blvd, Suite 3100
    Tampa, FL 33602

    Jeffrey A. Lamken
    **MOLOLAMKEN LLP**
    Suite 660
    600 New Hampshire Ave., NW
    Washington, DC 20037-2417

    Lauren L. Valiente
    Michael P. Matthews
    **FOLEY & LARDNER, LLP**
    Suite 2700
    100 N Tampa St
    Tampa, FL 33602

**Counsel for William Kale:**
    Patrick M. Donahue
    **WISE & DONAHUE**
    18 West Street
    Annapolis, MD 21401

8201260-v1

Robert A. Leventhal
**ROBERT A. LEVENTHAL, PA**
220 N Rosalind Ave
Orlando, FL 32801

Stanley J. Reed
Lauri E. Cleary
**LERCH, EARLY & BREWER, CHTD.**
3 Bethesda Metro Center, Suite 460
Bethesda, MD 20814

**Counsel for Peter Clay:**

Paul M. Sisco
William F. Jung
**JUNG & SISCO, PA**
101 E Kennedy Blvd, Suite 3920
Tampa, FL 33602

Lawrence S. Robbins
Mark T. Stancil
**ROBBINS, RUSSELL, ENGLERT, ORSECK & UNTEREINER, LLP**
1801 K St NW, Suite 411-L
Washington, DC 20006

Greg Kehoe / by Heather Mitchell with permission
Greg W. Kehoe